Next case on the docket is People v. Howard, clause number 5-13-0225. And when you get all ready, Ms. Horner, you may proceed. May it please the Court, my name is Amanda Horner from the Office of the State Appellate Defender, and today I'm representing Ms. Rachel Howard. Your Honors, the State has conceded the third issue with regards to pretrial custody, so today Ms. Howard will confine her arguments to just issues 1 and 2. Your Honors, this case undoubtedly involved a brutal assault against Aidy. She was gang-raped, beaten, and left beside a storage shed, where she had to be found by a police officer and her friend later on. It was certainly a disturbing case, but that was not the question before the jury. Ms. Howard has never disputed that this assault took place. The question before the jury was whether Ms. Howard was personally responsible for the acts of these three men, whether she was personally responsible for assaulting Aidy. Now, in the trial court below, the State did not present any evidence, nor was it the State's theory that this was a pre-planned conspiracy-type crime. In other words, the evidence the State presented below was that Ms. Howard would have had to actively have participated in this crime, specifically that she was involved in physically assaulting A.E. while this assault took place. Now, the question before the jury, the evidence was graphic and disturbing, as it often is in these types of cases. And therefore, it was incumbent upon the trial court, in this case Judge Cook, to be extra vigilant to make sure that only evidence that was relevant to whether or not Ms. Howard was personally responsible for the actions of these three other individuals was admitted at trial. And it's here that Judge Cook committed two errors that ultimately denied Ms. Howard of her right to a fair trial. First, he excluded evidence that would have went to her defense, and more importantly, he included evidence that was non-relevant and highly prejudicial. In particular, he allowed People's Exhibit 6 to be played before the jury. Now, part of People's Exhibit 6 is an interrogation video where Ms. Howard does make some limited admissions. And certainly, Ms. Howard does not contest that that portion of the video should have been played for the jury. The State agreed beforehand to redact certain portions, in particular where the officers called Ms. Howard a monster and there were other derogatory terms used, and those were redacted. But defense counsel still objected to People's Exhibit 6, specifically from minute 23 until the end. Now, it's important to note at this point that the admission of Ms. Howard came before minute 23. In other words, defense counsel never said that this part shouldn't be played, only that from minute 23 on, it should be redacted for several reasons. First, most of the last minutes of this interrogation video were simply two officers having a conversation about what they thought occurred, and in highly inflammatory language. The majority of them were not questions, and for the most part, Ms. Howard made no responses. Therefore, it was irrelevant as to whether or not this crime occurred, or if so, what level of involvement Ms. Howard had. Now, that part that you're talking about after minute 23, that was a part where statements were made such as, you're just as guilty as the other one. Absolutely. Those kind of statements. Absolutely. And there's several key statements. For example, the jury heard Officer Ferry say, that's like something you read about in the movies that you don't actually think happens in real life. It's a horror story. That's a horror movie in the city of Belleville. Unbelievable. We got a girl that is in the hospital admitted with just fractures throughout her face and body breaks and laying in bed. And then later, the police go on to say, and again, the jury heard this, and you are part responsible for that. You are just as responsible as they are. You ought to be ashamed of yourself because you are just as responsible as they are. And during all that time, she made no statement whatsoever. This was just the officers talking. Well, it is actually put in verbatim, in brief. The officers make several statements where they don't ask any questions. And finally, Officer Espion says, do you have anything to say for yourself? And Ms. Howard said, I should have called the police. And then she goes on to say, I was scared something might happen to me because they were with me the whole time. You know. Certainly that goes to her knowledge. She never disputed that. And perhaps that one portion should have been included. But a lot of this language where she's responsible, it came out after that. And the only statement she makes following that language, you are responsible, the police officers say, have we treated you well while you were here? And she says yes. Let me make sure I understand her statement about I should have called the police team before minute 23. No. Okay. I'm confused now. Okay. So at minute, sometime before minute 23, Officer Espion says, and then you kicked her or hit her or something like that. And she says, I might have. Okay. So that's certainly the admission that the state sought to have admitted. Okay. And I actually think to be more exact, it's about minute 22 of 56. Espion and Ferry then engage in this sort of conversation. And it goes on for about a minute where Espion describes the crime. Again, this is not based on personal knowledge. He's conjecturing and he admits that in a motion to suppress. And then Ferry and Espion go on to talk about this is a horror story, the language that I just read to you. And then Ferry says, you're lucky she's alive. You're lucky she's alive. He repeats this several times. It's at that point, I'm going to say it's about minute 25 where Espion finally says, do you have anything to say for yourself? And she says, I should have called the police. And then has this language about, I was scared something might have happened to me. Now, after that, and again, she says nothing after the statement at all except for you haven't mistreated me in custody. It's when Ferry says, you ought to be ashamed of yourself and repeats this multiple times. Now, to the extent that it was important the jury know that Ms. Howard knew this assault took place, the state has perhaps inserted that section there that says I should have called the police, although that had already been played in another part of the interrogation video. But Espion's statement that this is a horror story, you know, in the city of Belleville, and their conversation about their conjecture about what actually took place has nothing to do with whether or not Ms. Howard is responsible for the rape of this woman. Certainly, the very last statement that's played, you are just as responsible as she is, and that's repeated multiple times. That comes after everything that Ms. Howard has to say. There was no reason for that to be played. These officers had no personal knowledge of Ms. Howard's role beyond what she had told them in this limited engagement. They were not occurrence witnesses. This was not an occurrence witness who viewed something and was drawing a conclusion from that. They were simply police officers interrogating a suspect. There was no reason for that to be played for the jury for several reasons. Besides having personal knowledge, these are police officers, so they necessarily have indicia of authority. And so now the jury, after hearing this horrific evidence of a rape, is now hearing these police officers repeatedly tell Ms. Howard that she's responsible for the commission of this crime. Well, now, wasn't there some evidence that she was kicking the party in the neck or head? There was some evidence. And Ms. Howard, again, the evidence is what the evidence is in the record. But the jury should be able to judge what the evidence that was actually presented at the trial. And again, that was actually rather limited evidence. Amy testified that during the course of the assault, Ms. Howard kicked – or actually, she didn't say Ms. Howard. She said an unknown individual. But Ms. Howard doesn't dispute there wasn't another individual there. Kicked her about the head. And then she also added at the trial some other language about how this unknown individual was holding her leg. Interestingly enough, that was the first time that information had ever come forward. And she admitted at trial that her memory was based on the head trauma and the medicine she was on. She had some difficulty putting together everything that occurred. And this is all very important because it goes to Ms. Howard's actual defense was that she was, in fact, involved in a physical altercation with A.E. just before this sexual assault took place. She and A.E. got into a fight over a cigarette, and it turned physical. And Ms. Howard, again, has never denied that. She hit her, kicked her, whatever, A.E. about the head, but not related to the sexual assault. And Ms. Howard has always contended that it was the combination of the head trauma, certainly, but also A.E.'s heavy intoxication that just sort of confused the timeline given everything that had happened. That was Ms. Howard's defense, which also goes to the first issue. Judge Close specifically excluded evidence from the treaty of position, excuse me, that Ms. Howard had to be treated for alcohol poisoning and had a BAC of .072. Thank you. Thank you. We'll give a chance to Stacy. Good morning, Your Honor. Good morning, counsel. May it please the court. The defendant in this case argues that the trial court denied her a right to put on a defense in this case when the court barred Dr. Robacher from testifying because in the defense's eyes, he would have supplied crucial information to support the defense theory. There were two areas in particular the defense thought Dr. Robacher could help their case and aid the jury in making a determination. The first is the argument that A.E. was so intoxicated she could not identify the defendant as the woman who was attacking her while she was being raped by two men. The second is that A.E.'s memory of the events could have been affected by the amount of alcohol she consumed in addition to the level of trauma that she underwent. And, again, the defense thought Dr. Robacher might be able to help establish these things. With regard to the first assertion that A.E. may not have been able to identify specifically who the woman was who was kicking her while she was being raped, A.E. testified very truthfully that she had somewhere between five to seven beers to drink while she was at the party, one to two shots of vodka. Admittedly, some of her memory might have been impaired because of the alcohol, and she even admitted on cross-examination that she probably would not have been legally able to drive based on the amount of alcohol she had. Even though she wasn't... You know, you say she testified truthfully that she had five to seven beers, but isn't that the whole point of the defense? They're saying that wasn't truthful because she had a blood alcohol level of .272, and they wanted to challenge her testimony that she only had five to seven beers. Well, Your Honor, I think the testimony establishes that A.E., Angela, arrived at the party at 1030 at night. These...the rape and the attack happened somewhere around midnight. I don't believe there's any evidence that five to seven beers and one to two shots of vodka could not have caused that level of impairment. That's A. B, that level of impairment is nowhere in the record except in defense counsel's argument, and I think that's part of the problem with this Dr. Ropoffer is he was never tendered as a witness in the case. The night of the...the night before the second day of trial is when defense counsel sent the text to the state about, I'm trying to get these records from this doctor, and by the way, I want to call him as a witness, and the state moved in limiting to have that blood alcohol excluded because there wasn't anything to establish what the blood alcohol was. I'm not sure what was in that hospital report because it's not in the record, and there was no offer of proof made regarding Dr. Ropoffer's curriculum vita. There was no record about what report he may or may not have relied on. We only have defense counsel saying he was the treating physician. She was treated for alcohol poisoning. All of that is really just speculation and argument of counsel, which is not evidence in the case. A.E. was sure that the woman who was kicking her and hitting her while she was being raped was the same woman that fought with her earlier over the cigarettes. Does that matter in this case? No, it doesn't, and the reason is A.E. admitted she was that woman on the scene. She admitted that I might have kicked and slapped her while these two men raped her, and in addition we have Richard Hoffmeister. Richard had been drinking as well. Apparently his level of tolerance was quite high because he had over 10 beers, but he knew the defendant. He lived next door to her. He was familiar with her, and he was friends with her. He saw that she was kicking Angela while she was on the ground being raped by these two men. I thought that he wasn't present for the rape. I thought that he went to get help. What his testimony was, Your Honor, is that he saw Angela kicking A.E. while two men were bent over her. And this is after the time that they supposedly had a prior altercation over a cigarette. That's correct. Okay, so it's at the same time as the rape is maybe about to begin or something. My recollection is both Angela and Richard were hit by one or two, possibly two individuals, and Richard was knocked to the ground. He was able to see part of what was going on, and he saw that two men dragged Angela off towards the shed. He heard all these screams Angela was making, and then when he tried to do something, he was chased off and had to eventually run down to the police station himself to get somebody to come down for help. So we do have identity. It's not an issue that A.E. could or could not say who that woman was. It's not a mystery. The defendant put herself there on the scene. I don't believe there's anything more Dr. Rohrabacher could have added, and I believe the trial court was correct in saying that even if he could have come in and testified any further information about that blood alcohol level, since A.E. admitted she had consumed a lot of alcohol, it's cumulative. It doesn't really aid any more to the jury, and I believe that, again, is not an issue. A.E. did admit she blacked out. She remembered screaming, but her regulation was every time she screamed, she got hit harder or punched harder. So I don't think that Dr. Rohrabacher's testimony about the blood alcohol level  certainly couldn't have removed her from the scene where the defendant admitted she was there. She admitted she was an arm's length away from A.E., that she might have kicked A.E. or punched her. And with regard to the video, I took some notes as I watched it, and I think defense counsel indicated after minute 23 there wasn't really anything there except things that were inflammatory. I think the issue that you have here, though, is on legal accountability. That issue is one of the totality of the circumstances. As A.E. is being questioned, little things trickle out here and there. Well, I might have hit her. I might have kicked her, punched her while these men raped her. Yeah, I think I saw something happen when this man was raping her. I have a note here at minute 33 and 35 seconds. I kicked her once. I have a note here at minute 48, 14. Angela was trying to get back up at minute 23, 25. After the fight, that lady was raped. So that goes directly to the timeline involved. What about just the, I mean, evidently there was, you know, a period of however many seconds it was of the two police officers more or less engaging in a monologue and saying things like you're just as guilty as they are. What about that? I mean, you've got police officers here. It's not questioning. It's just them expressing their opinions on what really is the ultimate issue in the case, accountability. I believe what that was was standard police work, that during interrogations they do try to get a defendant to make admissions. But that doesn't mean it should be played before the jury. I mean, that's a different issue. I have a question. What was tried, attempted to be kept from the jury with respect to this video? On the redaction of the video? Yes. I believe some of what was redacted from that video were things where she was described as an animal and how could you live with yourself. And I think when the state came in and talked about after the redaction was done, I tried to get as much of this redacted as possible. But what did the defense want redacted? That's my question. I think that what the defense wanted redacted was any information where comments were made about the defendant like you're an animal, how can you live with yourself. Okay, so what's at issue here was something the defense wanted redacted? The defense did want it redacted. Okay. And I will say this, Your Honor, that the trial court looked at that entire redacted video before the jurors saw it. And the trial court was satisfied that the redaction was sufficient to protect everybody's rights in this case. And it's that decision that's up on appeal. Exactly. Yes, it is. I think what's clear here today is the defendant is minimizing her level of participation in this. And as her comments came out and as the questioning continued, I think maybe that the officers were able to break down her will a little bit more for her to see you were just as involved as they were. Except that perhaps all that could have been accomplished without the jury hearing the inflammatory language that is irrelevant. I believe that it could have. That video could have been redacted more. But I believe what we are looking at here again under both of these issues is that the trial court abused its discretion that people believe it did not and asked me to affirm the jury's verdict. Thank you, Your Honor. I have a question. I think you said prior that your defense was that she was heavily intoxicated and that clouded her ability to maybe know the sequence of events. Yes. How are you intending to prove that in your case in chief? Well, initially, this all came out because the day before trial, the state filed a motion in limine saying that defense counsel couldn't discuss blood alcohol content levels. Well, how did you intend to discuss blood alcohol levels? I'm going to assume that the defense counsel was going to get this in through witnesses. And, in fact, the state had said that it was going to front that she had heavy alcohol consumption. The state agreed that we're going to put that information. We agreed that she did. Did she know? Did you think that she was going to be able to quote what her blood alcohol level was? Was that what you were relying on? Well, again, and this is, again, trial counsel. I believe he there's some discussion that he was a little bit confused. He thought he could impeach Ms. Howard or he thought he could impeach A.D. with her medical report. And he said, you know, he was going to ask her, what was your blood alcohol level, how much did you drink? And if she were honest, then, of course, it wasn't an issue at all. If she didn't know what her blood alcohol level was, which I'm presuming she probably didn't know. That's right. How that's impeachment? Certainly. Your Honor, I don't disagree. He should have had, he should have had discussion with us. They should have been on the witness list. The report and the lab technician or the doctor, if they intended to use them in their case in chief, not rebuttal. Because this is a rebuttal. That's right. And all the cases you have discussed rebuttal. Right. I agree, Your Honor, that defense counsel, to have been cautious, should have put that in his case in chief. It's not just cautious. It was poor lawyering. I will concede that as well, Your Honor. It was poor playing. But at the end of the day, when the state said they were going to front this evidence, it didn't become, you know, an issue until several of the witnesses presented testimony that would have indicated that A.E. was not nearly as intoxicated as medical records show that she was. For example, the state just argued that she didn't arrive at the party until 1030, but there's evidence in the record that she, in fact, arrived as early as 730. And that's page 219. Mr. Hoffmeister testified to that. The party started as early as 330. So this drinking that she said could have went on for any number of hours, so that doesn't necessarily. But this is her testimony, the 1030, and that makes her more intoxicated than arriving at 330. That's right. The blood alcohol level was not taken until 130. It's unclear, Your Honor. But five to seven drinks doesn't necessarily equal to .272, which is a level of almost unconsciousness. And this wasn't an expert report. This wasn't something prepared in litigation. This was discovery material the state had in its possession longer than defense counsel and had actually turned it over to defense counsel as part of A.E.'s treatment records. And, you know, the state has tried to argue there was no offer of proof, but I think when you read the transcript, it's clear that everyone below understood, defense counsel, the state, the judge, that there was, in fact, treatment records indicating that A.E. was treated for alcohol poisoning and she had a BAC of .272. And that's troubling. What's more troubling in this case, actually, is the video that was played before the jury where the police are allowed to make these statements. I agree with that. And the state mentioned that there were some admissions made after, like, at minute 44. I think it's important to note there are two separate interrogation videos. There was one interrogation that lasted, I want to say it was an hour and a half, something like that. I mean, it's been a while since I've looked at that, but I think it was an hour and a half. And then there was a second interrogation video that was a much shorter video. And it's that portion of the interrogation video that's at issue here. So I think some of those comments that maybe came at, like, minute 44, that was not actually the video that is in dispute, People's Exhibit No. 6. Ms. Howard, certainly if Ms. Howard made some incriminating statement about something that she did or did not do at the scene, that's relevant. And barring the motion to suppress order, it should have been played to the jury. But the comments by the police, this monologue that they're engaging in, it's not relevant. It does nothing but to prejudice the jury. And what's more, this is a preserved error. She claims that it denied her a right to a fair trial, that these officers made the decision for the jury. And that should not be allowed to happen here. If the Court has no other questions, then Ms. Howard requests that this Court remain in different instruments. Thank you. Thank you both for your briefs and arguments. We'll take this matter under advisement and issue a decision in due course. Court is recessed until 1 p.m.